That's not true, Your Honors. Usually I'm sitting at their table, but today I'm not. May it please the Court, Counsel. My name is Murphy Classing. As you know, I represent the appellants in this case. And I would like to start off by just making a couple of quick comments. Nicholas Kristof, who's an American journalist, said that the greatest problem is not with flat-out white racists in our society, but rather with the far larger number of Americans who believe intellectually in racial equality but are quietly oblivious to injustices around them. And for many years, I think I was a lawyer in that number, a larger number. I grew up in El Campo in Houston, Texas, in a white, middle-class home. I believe that racism has only existed in sort of the fringe, unintelligent minority that everyone knew about and was sort of off to the side. Why don't you go ahead and move to your – move to the – I will, Your Honor. We don't really need a press conference. I appreciate that. The reason I brought that up, though, Your Honor, is we're under the 12B6 standards. I know you have a number of these cases come before you all the time. You know the standards. I don't need to go through them. And you know in large part my argument is give us a chance. Don't shut us out at the courthouse steps. And so in this case, though, because the facts are so long and intense and create an image when you first read them of things that seem, how could this happen? How could these things have occurred in a community? I think sometimes the tendency for a court, and I'm not saying the district court did this, but I think a tendency of human beings is to look at that and go, wow, how could that have happened? And that kind of taints the view. And I think at a 12B6 stage and even at the TCPA stage, we need to look at the facts applied as true and give the benefit of the doubt in many respects to the appellant in this case. And so I'm just reiterating that. I know you know it. I'm just reiterating it because I think this case has a set of facts that uniquely requires me to reiterate it one more time. Let me talk about the TCPA anti-SLAP stuff first. I'll get into that briefly. It was conceived of. Before you do that, just as a housekeeping matter, your brief includes several references to appendices that apparently weren't attached to the brief upon the initial filing. And then I believe the clerk's office so advised that appendices were not allowed, that the attachments were removed, but the internal references were not. Were the information in the appendices included in the revised briefs? Yes. So in the revised appendices that were filed, and I apologize, Your Honor. I wasn't the one who actually put that together. My understanding is they revised and refiled those appendices. If the references weren't changed, I apologize. I don't know how to fix that at this point. But I think the information is in the record on appeal, right? Yes, it definitely is. The only thing that was taken out, I think what had happened is we put together a chart that kind of summarized the claims and everything, mainly to help you guys out. And they rejected that because it wasn't in the record specifically. Okay. Go ahead. And we still have that chart. We'd happily give it to you if you need it. But, yes, it should all be there. With regard to the anti-SLAPP, it was conceded in part by the Plaintiff's Counsel that it applied to the defamation claims and to most of the defendants. The district court made a blanket statement that it was conceded it applied to everything. That really isn't true if you look at the record. But even so, it was conceded it applied to the bigger portion of the claims. So then the question becomes did the plaintiff establish with a minimum quantum of evidence necessary to support a rational inference that each allegation of fact is true? Did they do that? We made the argument both at the trial court level and also in the brief that really anti-SLAPP should not be applied at this pleading stage of the case. That was rejected by the district court because it wasn't brought up at the magistrate level. But we have reasserted in the brief we do think there is an argument there that under Rule 56, it's certainly unfair under the rules to conflate what the federal rules require and allow somebody to be ruled on on a TCPA type motion without development of the evidence. And so we do assert that. But even so, even having that in there, we believe that the facts that were pled and argued have met that burden. And so I want to go into how that works starting with defamation. And I really think, and I may be guessing wrong because there's a lot to guess here, but I think that the single publication rule and the substantial truth issues are kind of the bigger issues in the case. I'm happy to try to address anything else you may have questions about. Let me start with single publication. Simply put, the one year from publication rule has not been extended specifically to Internet publications directly. This court in 2007 in nationwide biweekly did, using an eerie analysis, say, well, we think this is where Texas is going, based on their analysis of some Texas cases. But in the Mayfield-Fullhard case out of Houston in 2014, the court, which ultimately did dismiss based on the single publication rule, did so after a standard was applied and after discovery. And I think one of the hard things in our current situation in society with publications is how do we deal with the Internet? And I think we've been dealing with it slowly, as the courts have been since 2000 maybe even, with issues such as penal code statutes, penalizing people from harassing people online or creating fake profiles, all the way to lawsuits under federal acts that allow you to sue someone for pretending to be your company or saying bad things about your company online. What Mayfield said is you have to look at the time and date of the publication was placed on the Internet, the indication of report or statements about that same publication about the plaintiff, and then whether that initial report has been reposted, republished, edited, changed, or altered in some way. And in order to do that analysis, you have to have some discovery. I do think we've pled in this enormous amount of facts here and the attachments there too a fact pattern that shows that did occur, but in order to decide whether the single publication rule should even apply in this case at the pleading stage, that's very difficult to do that kind of an analysis. For example, if you claim, as in here and as publications do, that this person is being charged with 37 counts of fraud and the allegations are that they've done this and this. The news does this all the time, right? They report on crimes before the person's guilty. That's what the news does. They're allowed to do that. Then Mr. Walker had a trial. All 37 counts were found. It was mistried, so he was not found guilty of any of them. He ultimately pled guilty to a paying taxes late charge. And then you have these republications and reassertions of all this fraud and theft and other things after the fact. So under this analysis, it would appear that there is some evidence that this publication has been republicized and maybe even altered or changed in some way and certainly been used against him again. And the problem we have with the Internet is with the 24-second news cycle, if I publish something tomorrow on the Internet on a blog and then one of you read it and share it with a friend a week from now, it's been published again, and then if I go back and edit a piece of it and you share it, I mean this happens all the time. But just because it's hard doesn't mean we don't need to do something about it. If you look at the cases on single publication, there's a particular quote from one of the cases that says, this is from 1983, publication is complete on the last day of the mass distribution of copies of the printed matter. That standard works really well for newspapers, for periodicals, and things of that nature. But in the Internet, that standard is very difficult to apply. Because something can be mass produced every day, every minute. So I do think the Court needs to look at at least the standard that Texas has started to come up with and at the very minimum say, look, guys, we need to go back and do some discovery to see whether or not this has been met. And I think that's why 12b-6 is inappropriate under that defense. With regard to substantial truth, the magistrate found, and I will admit that I'm a little baffled by this finding, the magistrate applied the standard in the Turner v. KTRK television case, which examined evidence to support a jury verdict, not a pleading, about whether or not substantial truth could defeat a defamation claim. And in that case, it says the courts must ascertain the statements, quote, in the sense that the ordinary reader would understand, and allegedly defamatory publications should be construed as a whole in light of the surrounding circumstances. Now, in this situation, what happened is Mr. Walker, it was stated in publications and stated in front of the BISD trustees and in various documents that he had committed fraud, that he had submitted improper invoices for payment, that he had had to pay back millions of dollars, and that he had committed theft. All four of those things the magistrate decided were substantially true to the fact that he pled guilty to paying taxes late on a particular invoice. And even his – Let me ask you on that point. Are there not assertions made that are not part of what he's pled guilty to? In other words, there's some reference in the record and in the briefing about some altered documents and some unnegotiated checks that are part of this accounting system. I mean, it doesn't have to be something that's part of the factual basis for the crime, does it? No. I agree. And there are some indications of that. What apparently happened is he had created two different sets of invoices, one for his internal accounting purposes for his tax lawyer and one for them. And what the evidence showed, and what Mr. DeGaran, who's a very well-renowned defense lawyer, I'm sure you've probably even seen him in this court, what he said in his affidavit is, look, the trial testimony was that his wife accidentally sent this to the district and then they pulled it right back and they never got paid on it. So this is sort of a – this has nothing to do with accusing someone of theft. And really, fraud and theft are the things that – if you accuse somebody of that, to me this is like saying I tell my secretary I have a headache and she calls my wife and tells her I have a brain tumor. I mean, that's not substantially true to having a headache. And theft and fraud is not substantially true to I submitted an invoice by accident, didn't get paid on it, and then paid my taxes late. I mean, those are so far afield that to find they're substantially true, I think, is a mistake on the part of the court below. The magistrate incorrectly concluded, and this is what I believe the opinion says, that the thrust of the publications was not affected by untrue information contained therein. I mean, theft is still in Texas a defamation per se violation. And you accuse someone of stealing who is trying to get jobs where they will be paid by a municipality to do that work is devastating. If you accuse somebody of theft in almost any position where they're going to be handling money or seeking money, it's devastating. So the plea was to paying late? Correct. Okay. Not any type of fraudulent or false statement. However, the factual basis for the plea did include the description of altered documents and unnegotiated checks, though, didn't it? It definitely did. It did mention it. We cited that little paragraph from the plea in our brief where it said that there was an indication he had altered some invoices and altered a check. But there was an entire explanation given for that both at the court level and, of course, obviously at this level by Mr. DeGuerin. And the reality is when you look at the fact summary in total, at least the pleading shows that everyone knew that. This was just to say that they were in a vacuum and, oh, we misread this, and so we reported it incorrectly, in light of all the surrounding facts and circumstances. It seems fantastic, frankly. And so we believe that there's plenty in there to allow us to go forward at least and do some discovery on that particular issue. Therefore, these fabrications that were made by the media defendants and what we call the conspiracy defendants are not entitled to protection under the TCPA or under 12b-6, and so we would ask the Court to allow us to develop that further, obviously, at the trial court level. Yes. Counsel, it would help me if you'd draw my attention to what in the news — I mean, I've got some of the news accounts here in front of me. What in the news accounts are you zeroing in on? I know you're talking generally about allegations of theft, et cetera, et cetera, et cetera, and we're comparing it to the factual basis. Tell me the words in the news accounts that — I appreciate you asking that very specific question, Your Honor. I will tell you that in looking at all of this, I will have to look at that to give you the specific answer because I've read so much of it. Well, no, I hear you, but I think we are talking about defamation, so I would think that the particular words matter. No, they absolutely do. And in fact, the quotes that are in — and we've quoted them in our brief. The quotes that are in there, some of them are, for example, that he had committed — had submitted false invoices to the board. I mean, I'm looking at one at 5590 that says, in his plea agreement, Walker signed a statement that he knowingly altered invoices that were submitted to the school district for repayment in the amount of $2 million. Is that the kind of statement that you contest and contend? Absolutely. Especially in light of the fact that he didn't even submit them. The facts that were from that were that his wife had done this, and number one, the amounts are correct. Number two, they also indicated that the board had voted to not seek the $2 million that had been forfeited from him. $2 million was not forfeited from him. So there's a number of different allegations in those accounts that are just flat-out false. There's no factual basis to them whatsoever. And what's frightening about it is that the people involved in this, even after the prosecution was over, and I'm jumping way ahead to some of the immunity issues, but the prosecutors and some of the agents involved actually were still pushing the board and pushing the trustees to not hire him, to cancel his contract, to publish information about this, which is an amazing thing. It's certainly beyond what I normally would see a prosecutor or an agent do after a case has been finalized. I'll turn briefly to the tortious interference issues. Basically, to put it in a nutshell, we believe we've put plenty of facts in here with regard to avoiding a 12B6 on tortious interference. Simply put, you have to have a valid contract, it has to be willing and intentional interference, and it has to cause injuries. The facts that have been pledged show that Mr. Walker had been treated completely differently than the other contractors. He had been required to produce all of these invoices and accounting, and the magistrate Just on the renewal, as I understand it, he had the contract. He did. You allege there's an effort made to sever that relationship and re-let the contract to someone else. Correct. There's two pieces to it. There's the fact that he wasn't renewed, which is the interference with the prospective contract, and the fact that during the contract he alleges that he was improperly terminated and wasn't given an opportunity to re-bid in the right way, and that, in fact, when he was being given that opportunity, there was a matrix, an evaluation matrix put together by the Board of Trustees, which alleged all of these same things again. This was well within the statute of limitations issue, which I'll get to in a moment. There's that he had paid back $2 million, that he had stolen money, that he had submitted false invoices, which gave him a score on part of this matrix of zero, which definitively excluded him from being allowed to continue to work there. And so, you know, under the tortious interference issues, I do believe that we are on solid ground on at least having pled sufficient facts to get us beyond 12v6, because we have shown the specific interference with his contract and with his prospective contract. One of the things that I want to address briefly is the issue of limitations. And part of the problem, and, of course, it deals first on the single publication rule. I dealt with it there. That's a one-year statute, and I've talked about that. But on these other issues, I think what's happened is, and if I was a group of defendants in this case, I think I would do this the same way. Each defendant has basically said, look, me personally, or we've done this thing, and this one thing that we may have done, even if we did it, was well beyond the statute of limitations, so we're out. We shouldn't be here. And have failed to look at the issue of whether or not under a conspiracy, whether the acts of one are attributable to the acts of all. There are plenty of acts pled from July of 2013 forwarding. That's the applicable two-year date of things that occurred, of issues that happened. But not every single defendant in the case fell within that timeframe. But if a conspiracy is being alleged, and if a conspiracy of all these actions can be shown together, then the acts of one in the statute would still apply to the others. And I think that's something that wasn't really addressed perfectly below, and I would ask the Court to look at that a little more carefully. More than enough facts have been pled connecting the activities of all these individuals. When I read this for the very first time and saw where it started, I thought, whoa, why are we starting here? Why are we starting so many years in the past in the story? And when you read the whole thing, you realize that the first eight or nine years of issues that are pled in there are really given to the Court to show how all of these parties are connected over time, resulting in what ultimately happened to Mr. Walker and Ms. Haynes. And so I believe that we've pled enough as well under that theory to go beyond the statute of limitations. I want to, because I don't want to lose all the time here, I want to jump to one thing with regard to the assault case. Ms. Haynes, the assault case was thrown out basically under the idea that the person that assaulted her had the authority to do so. And I'm obviously simplifying what the magistrate said, but that is also to me an amazing ruling. There is no fathomable way that a non-peace officer could be acting in the scope of his or her authority to assault another individual. The idea that that could happen, and in fact there was a case I think given to the Court yesterday with this Morrison v. Walker case where a bailiff escorted somebody out of the hallway who was trying to get into the judge's chambers, I think if I'm remembering that correctly. Well, that's a bailiff. A bailiff is a police officer. And in the situation that happened here, Ms. Haynes was assaulted by a non-police officer, and all that Mr. Neal had to do was say, you can't be here, and if she persisted, call the police officer over and have her escorted out. But instead he took it upon himself to breach the peace. And there's no area of the law that that's allowed. I mean, the best example I could think of was landlord-tenant law. Landlords get an eviction. They don't get to go into the person's house and drag them out. They have to get a constable to come do that because they're not allowed to breach the peace. And the magistrate even had issues with this, but Judge Crone overruled the magistrate and dismissed this claim as well. And I think based on what was before you, that should be reversed. With regard to immunity, which I'll spend the last minute here on that, overall, discovery is about to determine whether they were working in their official capacity or outside their official capacity. I mean, we have pled that they were acting outside their official capacity. This applies to the members of BISD, to the agents, to the prosecutors. Those things have been pled. There are specific facts that show that they were doing things outside of the prosecution of the claims against Mr. Walker. And so overall, our issue there is that we needed to have some discovery on the issues that we properly pled to show whether they were acting with or without their authority. Immunity isn't just blanket. You don't get, I used to be a prosecutor. You don't get to just say, I'm a prosecutor. I can speed. We don't have that right. And so certainly there needs to be some evidence, I think, portrayed. Without that opportunity, we can't do it. I think I have eight minutes left on the rebuttal, which is probably more than I need, but I'll pass this on to my opposing counsel. Thank you, Your Honor. Thank you, Mr. Tyson. You've saved time for rebuttal. Mr. Brush? May it please the Court. Good morning. I represent the school district defendants, appellees, other than Mr. Neal and Mr. Neld. I will not be addressing the anti-SLAPP statute because none of my clients moved for dismissal on that basis, but I'll begin and spend most of my time on what opposing counsel spent his time on, which is the fact that this is a tort case. It's essentially a defamation case at heart, and with respect to all of the school defendants, both the school district, the school district defendants that I represent, and the two school defendants that are represented by Mr. Gilbert, they're immune to any tort claims that plaintiff brought. We know as a matter of Texas law that the school district is immune to any tort claim that does not involve the use or operation of a motor vehicle. This case has no factual allegations pled to involve the use or operation of a motor vehicle, so all the tort claims against BISD can be set aside. As to all of the individual employees of the school district, including the Board of Trustees, all of them were entitled to dismissal under the Texas election of remedies premise, and that is because the plaintiffs sued both the school district and the individual defendants. They sued each of the individual defendants in their individual and official capacity. By suing them in their official capacity, they were suing the school district. By suing both of them, they made the irrevocable election to proceed only against the school district. That disposes of the defamation claims, the tortious interference claims, and the assault claim against Mr. Neal. All of those claims fall by the wayside under well-settled Texas law. Put simply, all of the school district defendants are immune to those tort claims. Opposing counsel argued, well, we pled they were acting outside the scope of their employment, and that takes them out of the realm of immunity. Their pleadings don't go far enough, Your Honor, and that is because under Texas Supreme Court precedent, if there's even a connection to the job duties of the employee, they're immune. In 2016 in Lavery v. Weatherby, the Texas Supreme Court held that the scope of employment test for the election of remedies doctrine is fundamentally objective. It doesn't, it's not controlled by whether there's an improper motive or an improper purpose. If there's a connection to the job duties, then immunity applies. Here, the allegations against the trustees are that they terminated a contract, that they had the power and authority, or did not renew a contract, they had the power and authority to enter into. That's squarely within their duties. It's not even incidental, it's squarely within. With respect to the other school district defendants, they were doing their jobs. The factual allegations that allegedly caused harm to plaintiff are that they exercised scrutiny over his billing, that they made statements related to the district's contracting. All of those things are within the scope of their duties. The plaintiffs and appellants have not taken this case outside of Texas law immunity for the school district defendants. And with respect to the assault claim, it was about the last peace opposing counsel argued. He argued, well, he had to wait for a peace officer. Not so. This court in Morrison recognized what the Texas Supreme Court has held, is that you look to whether or not there's a connection to the job duties. He was a board member at a board meeting attempting to maintain order. That's a connection to job duties. All of those claims fall by the wayside and require that the district court be affirmed. The last piece I'd like to talk about briefly is the RICO claims. They weren't addressed by opposing counsel, but, of course, they've been the subject of a significant amount of briefing. And I will speak to RICO globally to some degree on behalf of all of the appellees. I think the presentation we just heard highlights that this was primarily a defamation case. And every one of the defendant appellees has valid and viable defenses to those defamation claims that they'll highlight on the substances. I just did the immunity one for the school district defendants. But we know that defamation is not a predicate act under RICO. And the fact that there was so much focus on defamation really highlights the infirmity on the RICO claims that were brought below and have been argued here to this court. And that's that those claims fail at every single step of the analysis on a RICO claim. In the first instance, Mr. Walker probably does not even have standing under RICO because his only claim to damages are that he had an expectancy to another contract. This court squarely rejected that argument in the Gil Ramirez case, holding that a mere expectancy that you might someday get another contract is not an injury for RICO purposes. That alone forecloses the RICO claim because it negates— Well, there's also no separate RICO enterprise here. Pardon me, Your Honor? There's no separate RICO enterprise here. I agree, Your Honor. There isn't a separate RICO enterprise, and there isn't even a pattern of predicate acts. And so when we look to the predicate acts that were pled, almost all of them fall outside of the predicate acts that are authorized by statute. With respect to the Beaumont ISD defendants, appellants argued that the predicate acts were official oppression and misuse of official information. Those can't be predicate acts as a matter of law because they're not— can be predicate acts for purposes of RICO. I agree, Judge Smith, there's no enterprise properly pled, and that's independently fatal to the RICO claim. Finally, those few predicate acts that are identified, even if the plaintiffs could identify more than two, they still haven't identified a pattern for RICO purposes, and that's because of the additional requirement of continuity, which, as the panel knows, RICO is designed to strike at long-term organized crime, and so you have to have a long-term, long-running, broad scheme in order to satisfy RICO's continuity requirement. In the Malvina case, this court held that you can have more than two predicate acts, but you still don't have a RICO pattern if you don't have the requisite continuity. Here, the only predicate acts that you could even say came close to being pled all occurred within a very short time in a very discreet period related to Mr. Walker's criminal prosecution. As a matter of law, that single event can't constitute a RICO enterprise because it's necessarily closed, it's short-term, and there's no threat of recurrence. It's also targeted to only one purported victim, Walker, and the case law, both the Malvina case and the Empress Joliet case that we cite in our brief stand for the proposition that a single one-off enterprise targeting one victim does not constitute a RICO pattern. Counsel, did the BISD, in fact, issue any payment to Walker or his company based on any altered documents or any material that was submitted to look like an invoice for services of products not rendered, not provided? To my understanding, no, Your Honor. And, in fact, his plaintiffs pled BISD didn't really participate in the prosecutions. If there are no further questions, I will yield the remainder of my time. All right. Thank you, Mr. Gersh. Thank you. Mr. Gilbert. May it please the Court, my name is Chris Gilbert and I represent former BISD trustees Mike Neal and Tom Neal, and I've asked my co-counsel for 60 seconds to briefly address the issue of scope of authority as it applies to the assault claim against Mike Neal. Judge Crone below properly found that under Texas Education Code 37.105, which gives the school board the authority to eject undesirable people from school property, Mr. Neal's actions in removing Jessie Haynes from a doorway that she was blocking that would have led into a room on school district property where they were holding a press conference so that a member of the press could attend that press conference was at least incident to his duties as a trustee. Neal's actions were no different than the bailiff, we believe, in Morrison v. Walker, and certainly no different than the HR director in Rosencrantz v. Altzuhler, which is cited in our brief, that physically restrained an employee from talking in a meeting. Both of those employees were found entitled to immunity and we would ask that you uphold Judge Crone's decision below granting immunity to my clients. Thank you. All right. Thank you, Mr. Gilbert. Mr. Koenig. Good morning. May it please the Court. My name is Robert Koenig and I represent the International Brotherhood of Electrical Workers, the IBEW. My task this morning and the time that I have allotted is to address the issues in this case that affect the IBEW and those defendants who are allegedly affiliated with the IBEW. But as an initial matter, I need to mention that the various issues, or rather none of the issues raised by appellant's counsel, the TCPA, the single publication rule, the substantial truth defense, whether tortious interference has been properly pled, the effect of his conspiracy claim on the statute of limitations, assault and immunity have any effect whatsoever on the claims against the IBEW. I do want to talk about the district court's holding that several of the state court claims asserted against the IBEW were preempted by the exclusive jurisdiction of the National Labor Relations Board. But before I do that, I need to say at least a few brief things about the complaint generally and the nature of the allegations against the IBEW and those that the complaint refers to as IBEW agents. With respect to the IBEW and those labeled as IBEW agents, as the district court stated, the complaint actually contains very little other than conclusory statements and section headings. So if you look at the complaint itself, it says that the IBEW used its, quote, efforts to stop Mr. Walker. Even though those efforts failed, the IBEW and its allies were not through with Mr. Walker. And IBEW members, seeing their efforts thwarted, turned to allies for assistance. Those sorts of broad, general, vague conclusions, which the district court described as a void of factual detail, simply do not satisfy the pleading requirements of Iqbal and Twombly. And the complaint also fails to allege any basis whatsoever for the IBEW's alleged vicarious liability with respect to any of the claims asserted against the IBEW. It's well established an agency cannot be pled in a conclusory manner. This complaint labels, literally labels, several defendants as IBEW agents. But that label is no substitute for the actual allegations of fact showing that an agency relationship existed between the IBEW and those so-called agents, allegations of fact that are nowhere found in this complaint. When one looks at this complaint from the point of view of the claims against the IBEW and the so-called IBEW agents, it is impossible to determine who is alleged to have done what on whose behalf. And so the pleadings here simply do not provide any basis for holding the IBEW or the so-called IBEW defendants liable for any of the claims asserted in the complaint. Now, preemption. The district court held that the claims against the IBEW defendants for tortious interference, for civil conspiracy, and defamation to the extent not based on malice were all preempted by the exclusive jurisdiction of the National Labor Relations Board. The appellants in this case concede that those defamation claims, not based on malice, were properly deemed preempted, but not the tortious interference and civil conspiracy claims. The applicable standard for NLRA preemption is not in dispute. State claims based on conduct that is arguably prohibited or preempted by the National Labor Relations Act is... I'm sorry, prohibited by the National Labor Relations Act is and are preempted. Magistrate Judge Giblin in this case and District Court Judge Crone agreed that Mr. Walker was essentially accusing the IBEW and IBEW agents of committing an unfair labor practice, trying to force him to join the union and then retaliate against him for refusing to do so. There is no question whatsoever that it is an unfair labor practice under Section 8B1 of the National Labor Relations Act to try to force somebody to join the union or to retaliate against an individual for refusing to join. The District Court cited various NLRB cases. The appellants have made, based on similar patterns, the appellants made no effort whatsoever to distinguish those cases. The District Court also relied on Operating Engineers v. Jones, Iron Workers v. Perko, both cases in which claims against the union for tortious interference and conspiracy were deemed preempted because in each case the underlying claim was in essence a violation of 8B1 of the National Labor Relations Act. Your Honor, I see my time has expired. Unless the Court has any questions, I will sit down and turn this matter over to my colleagues. Thank you, Your Honor. All right, Mr. Leatherbury. Good morning, Your Honors. May it please the Court and Counsel, Tom Leatherbury representing the Examiner defendants and Mr. Rio. The District Court properly dismissed all of plaintiffs' claims against these defendants under both the Texas Citizens Participation Act and Rule 12b-6. I'd like to discuss plaintiffs' waiver of the argument that the TCPA does not apply in this case and Mr. Walker's failure to plead any viable claim for defamation, tortious interference, or civil conspiracy. I doubt I'll have time to reach the RICO issues, and I'll rely on Mr. Brush's presentation along with Magistrate Judge Giblin's and Judge Krohn's opinions on those many failures in the RICO pleadings of the plaintiffs. We furnished the Court with a bench book, and tab 1 contains the pertinent record on a plaintiff's waiver of any objection to the TCPA's application in this case. Tab 1a contains the colloquies between Magistrate Judge Giblin and Plaintiff's Trial Counsel at the hearing on these defendants' TCPA motions to dismiss. Beginning at the bottom of record, page 8994, and carrying over to the top of record, page 8995, Plaintiff's Counsel concedes that the TCPA applies to each claim brought against by Walker against these defendants. And Plaintiff's Counsel again concedes that the TCPA applies to the RICO claims and everything else. At page 9019, also at tab 1a, Counsel conceded the same for Ms. Haynes' claims against these defendants. Plaintiffs confirmed their concession at page 20 of their appellant's brief, which is at tab 1b. Plaintiff's concession, along with Magistrate Judge Giblin and Judge Krohn's reliance on that concession, puts this case squarely in the line of cases like Cuba v. Pilant and Lozevy v. Kurtz, where the court has enforced and applied the TCPA when the nonmoving party failed to object to its application. And here, even if there had been no waiver, there's no conflict between the TCPA and Federal Rule 12 based on this record. These defendants relied only on the Fourth Amended Complaint and documents referred to and attached to the Fourth Amended Complaint. The two examiner articles at issue, and Judge Duncan, we certainly agree with you that the words matter in this defamation case, those two articles are at tabs 2a and 2b of the bench book, and they were attached as Exhibits 2 and 12 to the Fourth Amended Complaint. Mr. Walker's factual basis and stipulation supporting his guilty plea was referred to throughout the complaint, and it's attached at bench book at tab 3, and it was attached as Exhibit 1 to our motion to dismiss. So on this record, the plaintiff's conclusory allegations were insufficient under both the TCPA and Federal Rule 12. Now, let me turn to the defamation claim, which is barred for several reasons. First is statute of limitations, and I want to address the single publication rule and this Court's prior holdings on the single publication rule. Second, the articles were not substantially false, as Judge Giblin analyzed, and I'll try to discuss that. Third, and we didn't hear anything about this from the Appellant's counsel, but the courts below found also that Mr. Walker was a conceited public figure, limited-purpose public figure, and he never challenged the lower court's decision that there was no actual malice pled or established. So that issue is waived on appeal. Fourth, Mr. Walker alleged no facts that would support any personal liability against Mr. Dodd or Mr. Rio, and under Texas law, that is insufficient and, again, it grounds for dismissal. So first is the statute of limitations. Counsel is really asking the Court to overrule both Nationwide, which was decided in 06 or 07, and Hamad, which was decided in 08 by this Court, and he's asking the Court to overrule those decisions when they defaulted entirely on their obligation or their right to ask for discovery under either the federal rules or the TCPA. So you can see from tabs 2A and 2B, which were attached as exhibits to the complaint, the date of the publications of the examiner articles were October 2012 and June of 2013. The suit was not filed until July 16, 2015, so well outside the one-year statute of limitations. Under the... And Nationwide and Hamad were both 12B6 cases, so the Court does apply when the pleadings negate a viable defamation claim. The Court certainly applies a single publication rule at the 12B6 stage. Let me talk about the waiver in this respect. Plaintiffs never alleged any facts such as republishing, reposting, editing, retracting, correcting, that sort of thing, that arguably could have restarted the statute of limitations. So there was no allegation to support the inference that discovery would lead to any relevant information, even if they had asked for it. Plaintiffs waived every opportunity they had to ask for discovery. They never sought discovery under the federal rules or the TCPA, even though the TCPA has a specific provision allowing discovery for good cause shown. Plaintiffs never responded to defendants' motion to stay discovery. Plaintiffs never objected to Magistrate Judge Giblin's order staying discovery. They agreed to an expedited hearing. At that hearing, they never asked for discovery, and they acknowledged in their brief at page 37 that it was a deliberate tactical choice not to seek discovery and to agree to an expedited hearing. A couple of words on falsity and substantial truth. Magistrate Judge Giblin properly placed the burden on the plaintiffs to allege and establish falsity. The standard is the same, no matter what stage of the pleadings you're at. And Magistrate Judge Giblin thoroughly analyzed the words that were alleged to be defamatory at pages 16 and 17 of his recommendation,  Thank you, Your Honors. Donald Donovan. Good morning. May it please the Court. Jonathan Donovan on behalf of the Beaumont Enterprise and Brooke Crum, its reporter. At the outset, I'd like to emphasize how limited Walker's allegations are against the Beaumont Enterprise and Brooke Crum. Out of a 222-paragraph complaint, only eight paragraphs address the Enterprise or Ms. Crum, and six of them are identifying the articles that are at issue, six different articles. The other two basically say that the Enterprise was used by and parroted other members of the conspiracy. So there's absolutely no factual content whatsoever in the complaint to substantiate the conspiracy claim, the tortious interference claim, the RICO claim, none at all. To the extent to which the defamation claim is asserted here, Beer is noting at the outset that this was daily reporting, news reporting by a local newspaper on a matter of significant public concern. And Walker himself refers to it in his sentencing memorandum, which is part of the record, as a controversial case that has vexed and divided the community and warranted a deep degree of following. So the articles by the Enterprise were absolutely accurate, and the defamation claims were properly dismissed, both on substantial truth and fair report grounds. Walker says in his brief, and his counsel said here today, that the media defendants had accused him of theft and fraud.  Not a single one of them says that he pled guilty to or engaged in theft or fraud at all. So that simply is not true with respect to the Enterprise. Essentially what his claim comes down to is saying that the plea agreement was misstated, because in each one of these articles there is a recitation essentially of the plea agreement that he entered into. And what he is saying here is that he didn't actually agree that he altered invoices and submitted them, that there is a passive voice used, or as some linguists say, a passive evasive voice. Mistakes were made. Invoices were altered. Invoices were submitted. And he points to the critical paragraph in the plea agreement 4B. And 4B starts out at the very beginning by saying that he submitted invoices, and it ends, after it deals with the specific altered invoice that he takes issue with, by saying that there were other altered invoices that were submitted by him. So to say that he submitted altered invoices is literally true. It is also substantially true, because Texas law provides wide latitude for the press in order to report on such things. Thank you, Mr. Dinella. Thank you very much. Mr. DeCondrova. Thank you, Your Honors. My name is David Vandecourt. I represent Michael Goetz, a Beaumont attorney and Senate council member. I adopt the arguments with respect to Rico of my co-counsel. I would like to distinguish Mr. Goetz. Mr. Goetz is a non-media defendant, and the claims against him arise from a slander, an oral publication, not a written publication. So there's no argument that the one publication rule has any applicability whatsoever. All the claims against Mr. Goetz arise from that one single July 2012 comment to the BIC Board of Directors. So they're all barred by the one-year limitations period. Even if a two-year period applied, they would still be barred. Thank you. Thank you, Mr. DeCondrova. Mr. Visosky. Good morning, Your Honors, and may it please the Court. Bradley Visosky, representing Malcolm Bales, who was the U.S. attorney at the time of the Walker prosecution. Bob Rawls, who was the assistant U.S. attorney who prosecuted the case. Deanna Stevens, Tim Brewer, the FBI agents. And I don't represent Corey Crenshaw, who was special assistant U.S. attorney at the time and then the acting district attorney of Jefferson County, but I'm arguing on his behalf and representing the law enforcement defendants as a group. One thing about this complaint is that in the recitation of the legal claims against the various defendants, none of the law enforcement defendants were specifically named. So it was impossible to tie any of the factual allegations to specific legal claims. And to the extent that they can be tied to legal claims, all of the claims brought by the plaintiffs were barred by absolute prosecutorial immunity. And this is made clear from the complaint itself, which recites that Malcolm Bales, who was the U.S. attorney, Bob Rawls, the AUSA, and Corey Crenshaw, who was then a special assistant U.S. attorney, worked on Mr. Walker's prosecution at the U.S. attorney's office, that they were working in the office on the case. After the federal trial resulted in a mistrial, there are also allegations about the working out of a plea deal and Mr. Rawls's efforts to secure restitution on behalf of the victims. All of those, as the district court correctly recognized, are prosecutorial functions for which these defendants have absolute immunity. And as for Mr. Crenshaw, there are some allegations by Ms. Haynes that during her criminal trial in state court, Mr. Crenshaw, who was the acting DA at the time, communicated with the prosecutor during the conduct of the prosecution, and that, too, falls within a prosecutorial function. All right. Thank you, Mr. Skosky. Thank you. Mr. Skosky? Rebuttal? Thank you, Your Honors. Obviously, there's a lot going on in this case. Let me address a couple of just quick issues. First, with the Beaumont Enterprise, I just want to bring the Court's attention to a couple of things regarding that particular defendant. And I've got their record pages, but there was an issue with the way the record was printed and then reprinted when we got it, so I don't know if these numbers are right, so let me give you the exhibit numbers to our petition, but they're 5, 6, and 7. The page numbers start at 5693, according to this, but I'm not 100% sure that number is correct. Anyway, all that to say, the Beaumont Enterprise and these three articles, which were all in 2014, and going into the specific words, said things such as, That's a quote from exhibit number 5. Exhibit number 6 from the Beaumont Enterprise says, Completely untrue. That's also in 2014. And in exhibit 7, the article says, Well, that's not at all true either. And so with regard to the Beaumont Enterprise specifically, I just want to suggest there are articles in 2014 where it's not just kind of close, it's completely off the chart in terms of what the truth is. One of the things that wasn't mentioned, and the things that I didn't mention in my first half, primarily because there's so much to talk about, I tried to pick and choose a few things to bring up, but we are certainly not waiving any of the arguments in any of our briefing. I want to talk about the civil rights violations quickly. The court ruled that the facts as played were not objectively reasonable under the civil rights violations, and, of course, immunity doesn't apply to these either. And so I do want to say that the case law, which has been cited in the brief, says that all you need is a short and plain statement of the claim. That's all that's required under a civil rights violation. And in that regard, the facts that were alleged with regard to that were both the oversight invoicing issues, not including Mr. Walker in bid request, the making up of the false statements, both orally in the paper and in the evaluation matrix, and specific requests of attendees of the Texas Alliance of Black School Educators for purposes that seemed to be only racially motivated, something he attended. And the court weighed that evidence and drew inferences against Walker in evaluating the 12b-6. I just think that the court went too far in looking at the facts and trying to infer what really happened from them against him instead of doing the analysis that I think 12b-6 requires. And so I do believe that there has been sufficient evidence pled under the civil rights violations. I apologize, my voice is disappearing. With regard to the other issues, it's impossible sitting here today for me to go through all the facts that were pled and the evidence and say, here's where this is, here's where this is. I mean, I would have needed a chart. We had a chart, and I thought, well, bringing that in here would have filled the wall. But I again implore the court to just look at the specific facts that were pled in the petition and match those up with the causes of action. I think in our brief what we tried to do, of course, we didn't draft the original petition, but we did draft the brief. We tried to break it into pieces so that to make, when I say this as easy as possible, when I look at your stack I want to start laughing, but we tried to make it as easy as possible to go through them one by one so the court could analyze them. In order to do so, this is not a case just about defamation. That is a big chunk of the case, and although I did spend some time on that, this case is not just about that. It's also about the civil rights issues, and it's also about the interference with this contract. I don't have anything else to really talk about. I rely on the briefing for everything else unless there's any questions. What's your best case on the preemption issue, the NLRA? On the NLRA? I think it's the best case that supports your position. I think Winfield is our best case. You know, I didn't talk about the preemption too much, again, because it's down in here, but, you know, the issue there, of course, is whether or not the claims are deeply rooted in state interest. I mean, we know that's what the standard is. I think the Winfield case, which is from this court, we would believe that has the most application. I mean, as stated in our brief and as stated in the petition, the oppression of African Americans based on race in order to obtain positions of authority and to obtain contracts, that's certainly a state interest. Interference with a contract, which is a state claim, is certainly part of a state interest. So, I mean, I think we've pled or attempted our best. The plaintiffs' counsel attempted their best to plead sufficient facts to cover that, but Winfield is the case for the short answer. I really want to spend one second to thank you for having us come down here. We were not expecting that we would be doing that in a case like this, but we're glad we were able to. It's a lot for that. I apologize that it's so much for you guys to look at, but I appreciate you guys doing so. Thank you. All right. Your cases and all of today's cases are under submission and the court is in recess until 9 o'clock tomorrow.